Maria TEJADA, Plaintiff,

v.

John J. CALLAHAN, acting Commissioner of Social Security, Defendant.

No. 96 Civ. 3892(SHS)(AJP).

United States District Court, S.D. New York.

Feb. 2, 1998.

Gwyneth M. Eliasson, Harlem Legal Services, Inc., New York City, for Plaintiff.

Maria Tejada, New York City, pro se.

Susan Baird, Asst. U.S. Atty., New York City, for Defendant.

## ORDER

STEIN, District Judge.

Upon *de novo* review of Magistrate Judge Peck's thorough Report and Recommendation dated December 9, 1997, and plaintiff's objections dated January 27, 1998,

IT IS HEREBY ORDERED that that "Report and Recommendation" is affirmed and defendant's motion for judgment on the pleadings is granted and plaintiff's cross-motion for judgment on the pleadings is denied.

## REPORT AND RECOMMENDATION

PECK, United States Magistrate Judge.

### To the Honorable Sidney H. Stein, United States District Judge.

Plaintiff Maria Tejada brings this action, pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of Social Security (the "Commissioner") to deny her disability benefits. Both parties have cross-moved for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c). For the reasons set forth below, I recommend that the Court grant the Commissioner's motion for judgment on the pleadings and deny Tejada's cross-motion.

## PROCEDURAL BACKGROUND

On August 5, 1993, plaintiff Tejada filed an application for Social Security Supplemental Security Income ("SSI") benefits. (Administrative Record filed by the Commissioner [hereafter, "R."], at 36–39.)[1] Tejada's application was denied on December 29, 1993 and again on reconsideration on March 2, 1994. (R. 53–56, 68–71.) At Tejada's request, a hearing was held before an administrative law judge ("ALJ") on December 6, 1994. (R. 199–229.) On February 11, 1995, the ALJ issued his decision finding that Tejada was not disabled. (R. 19–27.) The ALJ's decision became the final decision of the Com-

missioner when the Appeals Council denied Tejada's request for review on March 1, 1996. (R. 3–5.) This action followed. The issue before the Court is whether the Commissioner's decision that plaintiff Tejada was not disabled is supported by substantial evidence. (*See generally* Tejada Br. at 1–2; Gov't Br. at 1–2.)

## FACTS

### Tejada's Testimony Before the ALJ

On December 6, 1994, the ALJ held a hearing on Tejada's SSI application. (R. 199–229.) The ALJ began by noting that Tejada claimed disability "because of cataract condition, a hypotropic condition, and diabetes mellitus." (R. 201.) Plaintiff Tejada testified before the ALJ through an interpreter. (R. 204.) She testified that she was 59 years old at the time of the hearing and had been born in the Dominican Republic. (R. 206–08.) Tejada received no education, spoke but did not read or write Spanish, and did not speak or read English. (*Id.*) Tejada worked full time between 1990 and 1992 as an assembly person, assembling "big plates" used for cars. (R. 209, 223.) Her job entailed standing for eight hours per day, frequent bending and lifting up to ten pounds. (R. 209–10, 223.) She left this position in 1992 for two reasons. First, she needed to attend her daughter who was in a coma. Second, Tejada's own poor health prevented her from working. (R. 210.) (*See generally* Tejada Br. 2–3.)

Tejada had suffered from diabetes for the past 15 years and was taken to the hospital once in an ambulance because her sugar level had dropped to 50. (R. 204, 215.) She suffered from poor and blurry vision, but had not been told that she had cataracts at a recent eye exam. (R. 204–05.) She was receiving a further exam for cataracts in January. (R. 205.)

In addition, Tejada had been diagnosed with arthritis and suffered from pains in her back, legs, feet, knees, shoulders, hands and stomach. (R. 210–12.) Tejada testified that

1. Tejada's subsequent application resulted in a disability determination starting April 16, 1996; thus, only the closed period from August 5, 1993 to April 15, 1996 is at issue in this case. (*See* Tejada Br. at 10–11 & Ex. A.)

she had pain "constantly," including at the hearing. (R. 213–14, 224–25.) She kept her legs elevated 2–3 hours a day to relieve the swelling and cramps in her legs. (R. 227.) She further kept her legs in water for one hour for the daily pain in her knees and feet and took pain relievers that afforded no relief. (R. 225–27.) She also suffered from headaches and dizzy spells about four to five times per week and would lie down for several hours when this happened. (R. 227.) Additionally, she slept approximately one hour at night and not at all during the day, because of her pain. (R. 222, 228.)

Tejada testified that she could no longer work at the assembly job because she was "very tired" and lacked the strength. (R. 223.) She said she could no longer stand for a period of eight hours, nor frequently bend. (R. 223–24.) While she first stated that she could lift up to ten pounds (R. 218), she later asserted that she was unable to do so. (R. 224.) She could walk two blocks prior to experiencing fatigue, stand for 10–20 minutes in one spot, and could remain seated for a half hour. (R. 215–16.) She needed to hold on to something when bending. (R. 216.) She could not open and close the fingers of either hand. (R. 216–17.)

Tejada's fourteen year old niece was living with her and taking care of the apartment. (R. 220.) Tejada's daughter took care of the food shopping and sent Tejada all her meals. (R. 220–22.)

### The Medical Evidence

### Diabetes

Tejada was first seen at the William Ryan Community Health Center on February 12, 1991, and was diagnosed as having diabetes which was "poorly managed." (R. 121; see also Tejada Br. at 3.) Medical records show that from February 1991 through November 1994, the Ryan Center increased and adjusted the dosage of Tejada's insulin. (See Tejada Br. at 3.) In November 1993, the Ryan Center diagnosed Tejada as having diabetes

mellitus with peripheral neuropathy. (R. 159; see Tejada Br. at 4).

On January 5, 1994, Tejada was seen at the Ryan Center because she had run out of insulin and hypertension medication twelve days earlier. (R. 160.) Plaintiff was advised of the "importance of med[ication] compliance DAILY." (R. 160.)

On May 5, 1994, plaintiff walked into the Ryan Center, complaining of abdominal pain. (R. 166.) She was given orange juice and was taken to the emergency room for evaluation of low blood sugar. (R. 166, 215.) Tejada returned to the Ryan Center several times during the next two weeks for further evaluation of her low blood sugar. (R. 167–68.) Insulin treatment was discontinued, replaced by Micronase.[2] (R. 167–68.)

Tejada saw a podiatrist in October 1994, who diagnosed diabetes mellitus and prescribed Oxford shoes. (R. 120, 176.)

### Vision Problems

In July 1993, Tejada was given a general eye exam. Her vision was 20/30 in one eye and 20/25 in the other. (R. 103, 155.) On September 16, 1993, plaintiff underwent a consultative ophthalmologic examination by Dr. Doro. (R. 115–16.) Dr. Doro found that Tejada's uncorrected vision was 20/400 in each eye and her corrected vision was 20/100 in the right eye and 20/200 in the left eye. (R. 115.) The doctor opined that Tejada's vision was worse than could be explained by the examination findings. (R. 116.)

On December 7, 1993, Tejada underwent a second consultative ophthalmologic examination. (R. 106–07.) Dr. Irwin Schwade found that Tejada's visual acuity and near vision were 20/400 in each eye with and without corrective lenses. (R. 106.) Tejada claimed that she was unable to see the fixation target with either eye, although she entered and exited the doctor's office without bumping into equipment or furniture. (R. 106.) Dr. Schwade diagnosed hyperopia (farsightedness), presbyopia,[3] and functional amblyopia.

---

2. Micronase is administered orally. It is a compound used as a hypoglycemic in the treatment of non-insulin dependent diabetes mellitus. (Gov't Br. at 8 n. 9; Tejada Br. at 5 n. 12.)

3. Presbyopia is the natural loss of ability to focus the eye for clear vision on objects at hand, characteristic of middle and later life. (Gov't Br. at 7 n. 7.)

(R. 107 .) [4]

*Arthritis*

On September 2, 1992, Tejada visited the Ryan Center and complained of shoulder pain, but there were no positive clinical findings. (R. 139–40.) She was prescribed acetaminophen for arthritis. (R. 139–40.) In July and August 1993, she had edema [5] in her legs of uncertain etiology which was described as being "trace" in July. (R. 153, 157.) She was advised to elevate her legs and wear support stockings. (R. 157.)

On September 4, 1993, Tejada saw Dr. DeLeon, an internal medicine specialist, for a consultative examination. (R. 109–10.) Tejada told Dr. DeLeon that abdominal pain was occasional, that she came to the examination by train, and that she did her own shopping and cooking. (R. 109.) There was no leg edema in her extremities. (R. 110.) Tejada was able to bend forward to sixty degrees and she got on to the examining table without difficulty. (R. 110.) She had no back tenderness or muscle spasm, and the straight leg raising test was negative. (R. 110.) Examination of her neck, shoulders, elbows, and wrists was also negative, as was examination of her hips, knees, and ankles. (R. 110.) Tejada's grip strength was five out of five. (R. 110.) Neurological examination was normal. (R. 110.) There was no evidence of motor, cerebellar, or sensory dysfunction. (R. 110.)

Dr. DeLeon diagnosed controlled hypertension, diabetes mellitus type two, and arthralgia involving the back, knee, and shoulder. (R. 110.) Dr. DeLeon felt that Tejada's prognosis was fair. (R. 110.) She was able to sit with no limitation. (R. 110.) Her abilities to walk, stand, carry, lift, and push and pull were "slightly" limited because of arthralgia. (R. 110.)

On May 3, 1994, Tejada saw a podiatrist, complaining of pain and swelling in her ankles. (R. 165.) There was no erythema on examination. (R. 165.) The podiatrist diagnosed osteoarthritis. (R. 165.)

*Abdominal Pain*

In 1991 Tejada was diagnosed with abdominal tenderness and pain. (R. 130.) An ultrasound performed on April 24, 1991, revealed a prominent gallbladder, without evidence of cholelithiasis.[6] (R. 99.) An April 1991 upper G.I. series demonstrated mild gastroesophageal reflux. (R. 128–29.) Although plaintiff continued to complain of abdominal pain, abdominal examination was repeatedly within normal limits. (R. 123, 127–28, 132, 133, 135.)[7]

On September 2, 1992, Tejada complained of abdominal pain, but again there were no positive clinical findings pertaining to her abdomen. (R. 139–40.) She was prescribed Tagamet for gastrointestinal upset. (R. 139–40.)

At her January, March and May 1993 appointments, Tejada complained of abdominal discomfort, but examination of her abdomen was normal on each occasion. (R. 146–48, 152.) She was prescribed Mylanta and Tylenol in May 1993. (R. 152.)

On June 21, 1994, Tejada went to the Ryan Center with various complaints. (R. 169.) Although there was mild distension and diffuse tenderness on palpation of Tejada's abdomen, there were no focal findings or peritoneal signs. (R. 169.) The doctor suspected that some of Tejada's complaints might be non-organic, *i.e.,* a result of mental health problems. (R. 169.)

On July 26, 1994, Tejada was seen at the Ryan Center for various complaints. (R. 171.) Although Tejada had epigastric ten-

---

4. Amblyopia is an impairment of vision without detectable organic lesion of the eye. (Gov't Br. at 7 n. 8.)

5. Edema is the presence of abnormally large amounts of fluid in the intercellular tissue spaces of the body. (Gov't Br. at 4 n. 5.)

6. Cholelithiasis is the presence or formation of gallstones. (Gov't Br. at 3 n. 3.)

7. Plaintiff indicated several times in 1991 and 1993 that she was anxious and once that she was depressed (R. 123, 125–26, 134–35, 159, 172), but there were no clinical findings and, despite apparent recommendations or referrals for mental health counseling based on her complaints (R. 126, 134–35, 159), there was no indication that she followed-up to receive psychiatric or psychological evaluation or treatment. (*See generally* Tejada Br. at 7–8.)

derness, her abdomen was soft, with no organomegaly. (R. 171.) The doctor diagnosed chronic abdominal pain, with no signs of ulcer, prescribed Tylenol and Zantac, and advised Tejada to avoid alcohol, caffeine, cigarettes and spicy foods. (R. 170–71.)

Tejada returned to the Ryan Center on August 3, 1994, with various complaints of pain, which appeared partially "related to [a] stressful home situation." (R. 172.) Tejada complained of significant abdominal pain and tenderness over her intercostal nerves. (R. 172.) The doctor diagnosed diabetes mellitus, an increased right lobe thyroid, and chest pain. (R. 172.) The doctor continued Tejada's Micronase, Xanthic and Tylenol, and also gave her samples of Daypro, a nonsteroidal anti-inflammatory medication. (R. 173.)

Tejada missed or canceled her next three appointments at the Ryan Center. (R. 174.) On September 7, 1994, she underwent a sigmoidoscopy, which revealed internal hemorrhoids. (R. 175.) A September 9, 1994 ultrasound of Tejada's liver and gallbladder revealed no abnormalities and an ultrasound of the thyroid revealed slight asymmetry in the size of the lobe of the thyroid, without any abnormality. (R. 182, 183.)

On November 2, 1994, Tejada was seen by Dr. Marie Cadet at the Ryan Center for complaints of joint, chest and abdominal pain. (R. 177.) Her abdomen was tender to mild pressure on the right side, which the doctor diagnosed as diabetic neuropathy.(R. 177.)

### The ALJ's Decision

On February 11, 1995, the ALJ issued his written decision. (R. 19–27.) The ALJ found that Tejada had "not engaged in substantial gainful activity since August 5, 1993."

(R. 23, 26.) The ALJ found that Tejada has "severe hypertension, diabetes mellitus, incipient cataracts, internal hemorrhoids and arthralgia." (R. 26.) The ALJ determined, however, that Tejada "does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4" (impairments arising from cardiovascular disease (R. 26.)) From a review of the medical records, the ALJ found that Tejada's hypertension and diabetes are "controlled" and that there "is no evidence of complications nor end-organ involvement or damage secondary to such conditions." (R. 23.) The ALJ noted that "[n]o significant abnormal clinical findings are reported by her treating source during each and every examination." (R. 25.)·

As to Tejada's vision, the ALJ found that her best corrected vision was 20/100 and 20/200 in the right and left eyes, and noted the consultative ophthalmologist's opinion "that visual acuity findings and field results were not supported by objective visible findings on examination." (R. 25.)

The ALJ also found that a comprehensive internal medicine examination conducted in 1993 was "unrevealing" and that the doctor "assessed no restriction in [Tejada's] ability to sit, with walking, standing, carrying and pushing slightly limited because of arthralgia." (R. 24.) As to Tejada's arthritis, the ALJ noted that "a definite diagnosis of arthritis is not established in the record" and that the level of pain "alleged as totally disabling is not found to be supported by objective clinical findings and not found credible (Social Security Ruling 88–13)." (R. 24–25.) [8] The ALJ based this conclusion on the fact that Tejada's "treating source has apparently

---

8. Social Security Ruling 88–13 deals with the evaluation of pain and "provide[s] guidance on the consideration to be given to symptoms, including pain, in the evaluation of disability." S.S.R. No. 88–13, 1988 S.S.R. Lexis 14 at *1. That Ruling further provides that

Pain cannot be found to have a significant effect on a disability determination or decision unless medical signs or laboratory findings show that a medically determinable physical or mental impairment is present that could reasonably be expected to produce the pain alleged.

\*  \*  \*  \*  \*  \*

Medical history and objective medical evidence such as evidence of muscle atrophy, reduced joint motion, muscle spasm, sensory and motor disruption, are usually reliable indicators from which to draw reasonable conclusion about the intensity and persistence of pain and the effect such pain may have on the individual's work capacity.

Id., 1988 S.S.R. Lexis 14 at *2, 6.

not deemed it necessary to order x-rays or other objective diagnostic studies to further evaluate her complaint of generalized joint and low back pain." (R. 24.)

The ALJ concluded that Tejada "has a severe impairment which does not meet or equal any listed in Appendix 1 of Subpart P." (R. 24.) The ALJ found that the medical evidence indicates that Tejada "retains the exertional capacity for work-related functions that do not require lifting or carrying more than 20 pounds." (R. 25; *see also* R. 26.) The ALJ further found that Tejada "retains the residual functional capacity to perform her past relevant work as an assembly line worker making hubcaps and cleaning metal." (R. 25.) The ALJ concluded that Tejada "is 'not disabled' within the meaning of the Social Security Act." (R. 25; *see also* R. 26.)

### Evidence Submitted to the Appeals Council

On April 11, 1995, Dr. Cadet, an internist at the Ryan Center, reported that plaintiff had last been treated at the Center on November 2, 1994. (R. 196.) Dr. Cadet diagnosed diabetes mellitus, hypertension, pain on the right side of the abdomen due to diabetic neuropathy, and arthritis. (R. 196.) Dr. Cadet opined that Tejada could walk for a total of five minutes in an eight-hour workday, stand for thirty minutes continuously and two hours in an eight-hour workday, and lift and carry five pounds frequently and ten pounds occasionally in an eight-hour workday. (R. 196.)

On March 1, 1996, the Appeals Council affirmed the ALJ's decision. (R. 3–9.) The Appeals Council determined that Dr. Cadet's April 11, 1995 Report added nothing to the record that the ALJ had considered:

The report from Dr. Cadet indicated that she had last treated you on November 2, 1994, and the notes of this treatment are already in the record (Exhibit 18, page 57). Dr. Cadet's report, therefore, did not provide any new evidence that your impairments have worsened and her assessment of functional limitations are not supported by any objective clinical findings. Therefore, neither your representative's contentions nor the additional evidence from Dr.

Cadet provides a basis for changing the Administrative Law Judge's decision. (R. 4.)

### ANALYSIS

### I. THE APPLICABLE LAW

A person is considered disabled for Social Security SSI benefits purposes when she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see, e.g., Perez v. Chater*, 77 F.3d 41, 46 (2d Cir.1996); *Pickering v. Chater*, 951 F.Supp. 418, 422 (S.D.N.Y.1996) (Batts, D.J. & Peck, M.J.); *Burris v. Chater*, 94 Civ. 8049, 1996 WL 148345 at *2 (S.D.N.Y. April 2, 1996) (Stein, D.J.); *DeJesus v. Shalala*, 94 Civ. 0772, 1995 WL 812857 at *4 (S.D.N.Y. June 14, 1995) (Peck, M.J.), *report & rec. adopted by* 899 F.Supp. 1171 (S.D.N.Y. 1995); *Francese v. Shalala*, 897 F.Supp. 766, 769 (S.D.N.Y.1995); *Walzer v. Chater*, 93 Civ. 6240, 1995 WL 791963 at *6 (S.D.N.Y. Sept. 26, 1995) (Kaplan, D.J. & Peck, M.J.); *Coleman v. Shalala*, 895 F.Supp. 50, 53 (S.D.N.Y.1995). The combined effect of all impairments must be of such severity that the person

is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); *see, e.g., Pickering v. Chater*, 951 F.Supp. at 422–23; *Burris v. Chater*, 1996 WL 148345 at *2; *DeJesus v. Shalala*, 1995 WL 812857 at *4; *Walzer v. Chater*, 1995 WL 791963 at *6.

In determining whether an individual is disabled for SSI purposes, the Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claim-

ant or others; and (4) the claimant's educational background, age, and work experience." *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir.1983) (per curiam); *see also, e.g., Carroll v. Secretary of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir.1983); *Pickering v. Chater*, 951 F.Supp. at 423; *Walzer v. Chater*, 1995 WL 791963 at *6; *DeJesus v. Shalala*, 1995 WL 812857 at *4.

■ A court's review of the Commissioner's final decision is limited to determining whether there is "substantial evidence" in the record to support such determination. *E.g., Perez v. Chater*, 77 F.3d at 46; *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir.1991); *Mongeur v. Heckler*, 722 F.2d at 1038; *Dumas v. Schweiker*, 712 F.2d 1545, 1550 (2d Cir.1983); *Pickering v. Chater*, 951 F.Supp. at 423; *Burris v. Chater*, 1996 WL 148345 at *2; *Walzer v. Chater*, 1995 WL 791963 at *6; *Francese v. Shalala*, 897 F.Supp. at 770; *Coleman v. Shalala*, 895 F.Supp. at 54; 42 U.S.C. § 405(g). "Thus, the role of the district court is quite limited and substantial deference is to be afforded to the Commissioner's decision." *Burris v. Chater*, 1996 WL 148345 at *3; *see also, e.g., Francese v. Shalala*, 897 F.Supp. at 770. However, the Court will not defer to the Commissioner's determination if it is " 'the product of legal error.' " *E.g., Burris v. Chater*, 1996 WL 148345 at *3; *Francese v. Shalala*, 897 F.Supp. at 770.

The Supreme Court has defined "substantial evidence" as " 'more than a mere scintilla [and] such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971); *accord, e.g., Perez v. Chater*, 77 F.3d at 46; *Pickering v. Chater*, 951 F.Supp. at 423; *Walzer v. Chater*, 1995 WL 791963 at *6.

■ The Commissioner's regulations set forth a five-step sequence to be used in evaluating disability claims. 20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140, 107 S.Ct. 2287, 2291, 96 L.Ed.2d 119 (1987). The Second Circuit has articulated the five steps as follows:

■ First, the Secretary [now, Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. [2] If he is not, the Secretary next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. [3] If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Secretary will consider him disabled without considering vocational factors such as age, education, and work experience; the Secretary presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. [4] Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. [5] Finally, if the claimant is unable to perform his past work, the Secretary then determines whether there is other work which the claimant could perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir.1982); *accord, e.g., Perez v. Chater*, 77 F.3d at 46; *Dixon v. Shalala*, 54 F.3d 1019, 1022 (2d Cir.1995); *Pickering v. Chater*, 951 F.Supp. at 423; *Burris v. Chater*, 1996 WL 148345 at *2; *Walzer v. Chater*, 1995 WL 791963 at *6; *DeJesus v. Shalala*, 1995 WL 812857 at *4; *Francese v. Shalala*, 897 F.Supp. at 769; *Coleman v. Shalala*, 895 F.Supp. at 53–54. The claimant bears the burden of proof as to the first four steps; if the claimant meets the burden of proving that she cannot return to her past work, thus establishing a prima facie case, the Commissioner then has the burden of proving the last step, that there is other work the claimant can perform considering not only her medical capacity but also her age, education and training. *See, e.g., Perez v. Chater*, 77 F.3d at 46; *Berry v. Schweiker*, 675 F.2d at 467; *Pickering v. Chater*, 951 F.Supp. at 423; *Burris v. Chater*, 1996 WL 148345 at *3; *Walzer v. Chater*, 1995 WL 791963 at *7; *DeJesus v. Shalala*, 1995 WL 812857 at *5; *Francese v. Shalala*, 897 F.Supp. at 770.

## II. APPLICATION OF THE FIVE–STEP SEQUENCE TO TEJADA'S CLAIM

### A. Tejada Was Not Engaged In Substantial Gainful Activity

The first inquiry is whether Tejada was engaged in substantial gainful activity after her SSI application on August 5, 1993. "Substantial gainful activity" is defined as work that involves "doing significant and productive physical or mental duties" and "[i]s done (or intended) for pay or profit." 20 C.F.R. § 404.1510 (1993); see also, e.g., Pickering v. Chater, 951 F.Supp. at 424; Walzer v. Chater, 1995 WL 791963 at *7. It is undisputed that Tejada was unemployed throughout the applicable time period of August 5, 1993 to February 11, 1995. (R. 27.)

### B. Tejada Had A Severe Physical Impairment That Significantly Limited Her Ability to do Basic Work Activities

The next step of the analysis is to determine whether Tejada proved that she had a severe physical impairment that "significantly limit(ed) [her] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a). The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b). "Basic work activities" include:

> ... walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling ... seeing, hearing, and speaking ... [u]nderstanding, carrying out, and remembering simple instructions ... [u]se of judgment ... [r]esponding appropriately to supervision, co-workers and usual work situations.

20 C.F.R. § 404.1521(b)(1)–(5); see also, e.g., Pickering v. Chater, 951 F.Supp. at 424; Walzer v. Chater, 1995 WL 791963 at *7. The Second Circuit has warned that the step 2 analysis may do no more than "screen out de minimis claims." Dixon v. Shalala, 54 F.3d at 1030; accord, Pickering v. Chater, 951 F.Supp. at 424. If the disability claim rises above the de minimis level, then the further analysis of step 3 and beyond must be undertaken. Dixon v. Shalala, 54 F.3d at 1030.

The ALJ found that Tejada "has severe hypertension, diabetes mellitus, incipient cataracts, internal hemorrhoids and arthralgia." (R. 26.) The ALJ concluded that these ailments precluded Tejada from performing work-related activities § "involving lifting more than 20 pounds." (R. 26.) This amounts to a step 2 finding that Tejada suffers from a severe physical impairment that significantly limits her ability to perform basic work activities. See Pickering v. Chater, 951 F.Supp. at 424. This finding is not disputed by the parties.

### C. Tejada Does Not Have a Disability Listed in Appendix 1 of the Regulations

The third step of the five part test requires a determination of whether Tejada had an impairment listed in Appendix 1 of the regulations. "These are impairments acknowledged by the [Commissioner] to be of sufficient severity to preclude gainful employment. If a claimant's condition meets or equals the 'listed' impairments, he or she is conclusively presumed to be disabled and entitled to benefits." Dixon v. Shalala, 54 F.3d at 1022; accord, e.g., Pickering v. Chater, 951 F.Supp. at 424.

The ALJ found that Tejada's ailments did not meet or equal the severity of any of the listed impairments. Specifically, the ALJ found that Tejada's condition did not satisfy the requirements of the impairments or combination of impairments listed in Appendix 1, Subpart P, Regulations No. 4 (impairments arising from cardiovascular disease). This finding is not disputed by the parties.

### D. Tejada Had the Ability to Perform Her Past Work

The fourth prong of the five part analysis is whether plaintiff had the residual functional capacity to perform her past work as a metal factory assembly line worker and warehouse operator, assembling plates (hub caps) used for cars. (R. 22, 26, 209, 223.) The fourth prong analysis is determinative of the outcome of this case.

The ALJ considered Tejada's testimony at the hearing and all the medical evidence then

in the record, including records and/or reports from (1) Tejada's outpatient treatment at the Ryan Center (R. 121–85), (2) Dr. DeLeon, the internal medicine specialist who conducted a consultational examination (R. 109–14), (3) Dr. Doro, the ophthalmologist who conducted a consultational examination (R. 115–17), and (4) Dr. Schwade, the ophthalmologist who conducted a further consultational examination (R. 106–08).

Based on a review of this evidence, the ALJ found that Tejada had the functional capacity to perform work-related activities, except for work requiring lifting more than twenty pounds. (R. 25.) The ALJ found that Tejada's past relevant work as a metal factory assembly line worker and machine operator did not require lifting more than ten pounds and concluded that Tejada's impairments did not prevent her from performing her past work. (R. 26.) Tejada had the burden of proof on this issue, and I find that there is substantial evidence to support the ALJ's finding that Ms. Tejada was "not disabled" within the meaning of the Social Security Act.

On this appeal, Tejada raises three assertions. First, she argues that the Appeals Council committed an error of law in failing to give proper weight to the medical opinion of one of Tejada's treating physicians, Dr. Marie Cadet. (Tejada Reply Br. at 1–4.). Second, Tejada argues that the ALJ committed an error of law in failing to specify the basis for his finding that Tejada was not credible. (Tejada Br. at 13; Tejada Reply Br. at 6–7.) Third, Tejada argues that the ALJ erred in failing to specify the basis for his finding that Tejada could lift up to twenty pounds. (Tejada Br. at 12–13; Tejada Reply Br. at 5–6.)

**1. The Treating Physician's Rule**

The "treating physician's rule" is a series of regulations set forth by the Commissioner in 20 C.F.R. § 404.1527 detailing the weight to be accorded a treating physician's opinion. Specifically, the Commissioner's regulations provide that:

If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527(d)(2); *see also, e.g., Sanchez v. Chater,* 964 F.Supp. 133, 138 (S.D.N.Y.1997); *Toro v. Chater,* 937 F.Supp. 1083, 1091 (S.D.N.Y.1996); *Walzer v. Chater,* 1995 WL 791963 at *7. Further, the regulations specify that when controlling weight is not given a treating physicians testimony (because it is not "well supported" by other medical evidence), the Court should consider the following factors in determining the weight to be given such testimony: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence that supports the treating physician's report; (4) how consistent the treating physician's opinion is with the record as a whole; (5) the specialization of the physician in contrast to the condition being treated; and (6) any other factors which may be significant. 20 C.F.R. § 404.1527(d)(2); *see also, e.g., Walzer v. Chater,* 1995 WL 791963 at *7. The Commissioner's current "treating physician" regulations were approved by the Second Circuit in *Schisler v. Sullivan,* 3 F.3d 563, 568 (2d Cir.1993); *see also, e.g., Sanchez v. Chater,* 964 F.Supp. at 138; *Walzer v. Chater,* 1995 WL 791963 at *7.

Dr. Cadet's April 11, 1995 report was submitted to the Appeals Council after the ALJ's decision. (R. 4, 196.) The report stated that Dr. Cadet had last treated Tejada on November 2, 1994. (R. 196.) Dr. Cadet's opinion was that Tejada was able to stand up to one half hour continuously and for two hours in an eight-hour workday and to walk for five minutes continuously once during an eight-hour workday. (R. 196.) Dr. Cadet further noted that Tejada could lift and carry five pounds frequently in an eight hour workday, and lift and carry 10 pounds occasionally in an eight hour workday. (R. 196.)

The Appeals Council found that Dr. Cadet's functional limitation assessment was not supported by objective clinical findings. (R. 4.) The Appeals Council further concluded that Dr. Cadet's report did not provide any new evidence that Tejada's impairments had

worsened because Dr. Cadet's November 2, 1994 treatment notes already existed in the record before the ALJ. (R. 4, 177, 196.) The treatment notes from the Ryan Center reveal little in the way of diagnostic or objective clinical findings to support Dr. Cadet's restrictive functional capacity assessment. *See, e.g., Diaz v. Shalala,* 59 F.3d 307, 314–15 & n. 13 (2d Cir.1995) (treating source's opinion that plaintiff was totally disabled did not have binding effect where opinion was inconsistent with other examining physicians' reports and medical tests; since plaintiff had the burden of proof, "it was proper for the ALJ to rely on the absence of findings by any physician concerning plaintiff's alleged inability [to do her prior work] in deciding that she could resume her work"); *Sanchez v. Chater,* 964 F.Supp. at 139 (ALJ properly discounted treating physician's diagnosis where it was grossly inconsistent with the remainder of the medical record); *Toro v. Chater,* 937 F.Supp. at 1092 (ALJ properly rejected treating physician's opinion concerning plaintiff's lack of residual functional capacity for lack of supporting objective clinical or diagnostic findings and because there was inconsistent evidence in the record). Accordingly, the Appeals Council did not err by refusing to accord binding weight to Dr. Cadet's opinion.

As for the first two enumerated factors pertinent to a determination of the weight to be given to the opinion of a treating physician not accorded controlling weight (the nature, extent and length of the treatment relationship and the frequency of examination), it is especially significant that, as far as can be determined on the basis of the Ryan Center documents in the record, Dr. Cadet had examined plaintiff only once on November 2, 1994, prior to assessing her residual functional capacity. (R. 177, 196.) *See* 20 C.F.R. §§ 404.1527(d), 416.927(d); *see also Toro v. Chater,* 937 F.Supp. at 1092. With respect to the third and fourth factors enumerated in the regulations (the supportability of the opinion and the consistency of the opinion with the record as a whole), the Appeals Council noted that Dr. Cadet did not add any objective clinical findings to support her functional limitations assessment. Further, the Appeals Council noted that Dr. Cadet's treatment notes already existed in the record and were considered by the ALJ. (R. 4.) The Court cannot say that the Appeals Council erred in rejecting Dr. Cadet's report as a basis for overturning the ALJ's decision. *See also, e.g., Ferraris v. Heckler,* 728 F.2d 582, 585 n. 1 (2d Cir.1984) (where treating physician's finding was not supported by other consulting physicians, reports, ALJ could reject treating physicians opinion).

### 2. *Tejada's Credibility*

■ The Commissioner will consider statements about a claimant's pain or other symptoms, but they alone will not establish that the claimant is disabled. Rather,

> there must be medical signs and laboratory findings which show that [the claimant has] a medical impairment(s) which could alleged and which, when considered with all of the other evidence … would lead to a conclusion that [the claimant] is disabled.

20 C.F.R. §§ 404.1529(a), 416.929(a); *see also, e.g., Sanchez v. Chater,* 964 F.Supp. at 138; *Toro v. Chater,* 937 F.Supp. at 1086; *Lugo v. Chater,* 932 F.Supp. at 504; *Burris v. Chater,* 1996 WL 148345 at *5.

■ The ALJ has discretion to evaluate the credibility of a claimant and to arrive at an independent judgment in light of medical findings and other evidence. *See, e.g., Rivera v. Schweiker,* 717 F.2d 719, 724 (2d Cir. 1983) ("although it is clearly permissible for an administrative law judge to evaluate the credibility of an individual's allegations of pain, this independent judgment should be arrived at in light of all the evidence regarding the extent of the pain"); *Dumas v. Schweiker,* 712 F.2d at 1552; *Walzer v. Chater,* 1995 WL 791963 at *9. In the instant case, the ALJ specifically considered and rejected Tejada's allegations of totally disabling pain as being inconsistent with the clinical medical records. (R. 24.) *See Sanchez v. Chater,* 964 F.Supp. at 138–39 (ALJ properly rejected plaintiff's allegations of pain where they were inconsistent with the clinical records and with plaintiff's course of treatment by numerous physicians); *Burris v. Chater,* 1996 WL 148345 at *5–6 (not error for ALJ to consider plaintiff's complaints of pain but

to reject them as unsupported by her own testimony).

A review of the medical records demonstrates that Tejada had a long history of hypertension and diabetes mellitus. The ALJ noted, however, that "[t]here is no evidence of complications nor end-organ involvement or damage secondary to such condition." (R. 23.) Although there was one instance in which Tejada required brief hospital care for an abnormally low glucose level, her diabetes was controlled and well-monitored. With respect to Tejada's multiple complaints of abdominal pain, the ALJ noted that "objective diagnostic studies of same were unrevealing. . . ." (R. 23.) The ALJ properly found that "[n]o significant abnormal clinical findings are reported by [Tejada's] treating source during each and every examination." (R. 25.)

With respect to Tejada's ophthalmological examinations, the ALJ noted that although incipient cataracts were detected, "it was medical opinion that visual acuity findings and field results were not supported by objective visible findings on examination." (R. 25 .) The ALJ also noted that Tejada's treating source "makes no comment with regard to any visual deficits." [9]

With respect to Tejada's arthritis, the ALJ noted that no definite diagnosis was established in the record as Tejada's "treating source has apparently not deemed it necessary to order x-rays or other objective diagnostic studies to further evaluate her complaint of generalized joint and low back pain." (R. 24.) The ALJ concluded that the allegedly totally disabling pain "is not found to be supported by objective clinical findings and not found credible (Social Security Ruling 88–13)." (R. 24–25; *see* footnote 8, above, for a discussion of Social Security Ruling 88–13.)

Tejada contends that the ALJ erred in failing to specify the basis for his finding Tejada to be not credible. (Tejada Br. at 13); Tejada Reply Br. at 6–7, citing *Williams on Behalf of Williams v. Bowen,* 859 F.2d 255, 260–61 (2d Cir.1988) (a "finding that the witness is not credible must . . . be set forth with sufficient specificity to permit intelligible plenary review of the record.") (citing *Carroll v. Secretary of Health & Human Servs.,* 705 F.2d 638, 643 (2d Cir.1983)), and *Ferraris v. Heckler,* 728 F.2d 582, 587 (2d Cir.1984).[10]

*Williams* is factually inapposite. There, the ALJ rejected the uncontradicted testimony of the only two witnesses, the claimant and her mother, without making any credibility assessment at all. *Williams,* 859 F.2d at 258, 260. In fact, the ALJ did not mention the testimony in his findings. *Id.* at 260. The *Williams* Court found that both the claimant's and her mother's testimony "was uncontradicted and generally consistent with the medical diagnoses." *Williams,* 859 F.2d at 260. Here, on the other hand, Tejada gave conflicting testimony. While she first stated that she could lift ten pounds (R. 218), she later asserted that she was unable to do so. (R. 224.) Tejada also stated that she ate with a plastic fork and subsequently claimed that she could not use a knife, fork, or spoon. (R. 218–19.)

Moreover, the *Williams* decision was based on the lack of substantial evidence to support the ALJ's decision, since the objective medical evidence was consistent with the claimant's subjective testimony of pain. As the Second Circuit held:

> Put another way, an ALJ must assess subjective evidence in light of objective

---

9. The ALJ also considered Tejada's psychological condition. The ALJ found that "[t]here is no medical documentation of record from any psychiatrist" and that Tejada "has apparently not availed herself to psychotherapy in an attempt to improve her alleged adverse level of mental functioning." (R. 25.) The ALJ concluded that the evidence failed to establish the presence of any medically determinable psychiatric impairment. (R. 25.)

10. In *Ferraris,* on which Tejada mistakenly relies, the Court approved the ALJ's decision to "discredit[ ] any claims of debilitating pain" where the ALJ cited reasons that included contradictory medical findings, *Ferraris,* ability to carry out normal function, and the conservative treatment Ferraris received for pain. *Ferraris,* 728 F.2d at 586 & n. 1. Here, the ALJ did not specifically list the lack of serious pain medication in support of his determination; however, the ALJ's extensive review of the record persuades this Court that the ALJ necessarily took this into consideration.

medical facts and diagnoses. Here, the subjective testimony of pain and disability given by claimant and her mother is consistent with the objective medical facts and the experts' opinions. Consequently, we hold that the record in this case lacks adequate evidence to support the Secretary's determination.

*Id.* at 261. Here, in contrast, the ALJ addressed Tejada's subjective complaints of pain in his findings, explaining that he found them to be "noncredible" since they were not supported by objective clinical medical findings, and implicitly indicated that several of Tejada's examining physicians also found her complaints to be non-credible. (R. 23–25.) Here, the ALJ's decision was consistent with the medical evidence and thus satisfies the standard set forth in *Williams.*

Based on this Court's review of the record evidence, there was substantial evidence to support the ALJ's determination that Tejada's pain was not disabling and that it was not credible. *See also, e.g., Sanchez v. Chater,* 964 F.Supp. 133 at 139 (court reviewed the record evidence and held that the ALJ properly decided to reject plaintiff's allegations of pain).

### 3. *Residual Functional Capacity*

■■■ It is the Commissioners responsibility to determine a claimant's residual functional capacity. 20 C.F.R. § 404.1527(e)(2); *see also, e.g., Townley v. Heckler,* 748 F.2d 109, 113 (2d Cir.1984); *Ferraris v. Heckler,* 728 F.2d 582, 585 (2d Cir.1984); *Jones v. Shalala,* 900 F.Supp. 663, 669 (S.D.N.Y.1995). Here, the ALJ found that Tejada had a residual functional capacity to lift up to 20 pounds. The record contains substantial evidence supporting the ALJ's conclusion. With the exception of Dr. DeLeon, who noted that Tejada's ability to lift was "slightly" limited, none of the other treating sources placed any restrictions on Tejada's ability to perform lifting activities.[11] (R. 110.) *See Diaz v. Shalala,* 59 F.3d at 314–15 & n. 13

(holding that where burden is on plaintiff and no physician indicated any limitations on plaintiff's ability to sit, it was reasonable for the ALJ to conclude from the absence of particular findings by acceptable medical sources that plaintiff could sit for a prolonged period); *Dumas v. Schweiker,* 712 F.2d at 1553 ("The Secretary is entitled to rely not only on what the record says, but also on what it does not say."). The ALJ further noted that Dr. DeLeon "detected no musculoskeletal or neurological deficits and none is reported by the claimant's treating source." (R. 25.) Because the burden was on plaintiff to prove that she could not resume her past work, it was proper for the ALJ to rely on the absence of findings by any physician concerning plaintiff's alleged inability to lift more than ten pounds in deciding that she could resume her work as an assembly worker.

Tejada relies on *Ferraris v. Heckler,* 728 F.2d at 587, for the proposition that the ALJ erred here in failing to specify the medical or other evidence to support his finding that Tejada could lift up to 20 pounds. (*See* Tejada Br. at 12.) Tejada's reliance on *Ferraris* is mistaken. As the Second Circuit has made clear, in *Ferraris* the burden was on the Commissioner because the claimant had met his burden of proving he could not do his past work—in other words, at the fifth prong of the analysis, the burden was on the Commissioner. *See Diaz v. Shalala,* 59 F.3d at 315 n. 13. In contrast, both in *Diaz* and here, "not only was the burden on plaintiff, but also no physician indicated any limitations on plaintiff's ability [to perform her prior job]. Accordingly, it was reasonable for the ALJ to conclude from the absence of particular findings by 'acceptable medical sources' that plaintiff ... could resume that [prior] job." *Id.*[12]

This Court finds that there is substantial evidence in the record to support the ALJ's determination that Tejada had the functional

---

11. While Dr. Cadet concluded that Tejada could only lift five pounds frequently and ten pounds occasionally, Dr. Cadet's opinion was properly accorded little weight by the Appeals Council, for the reasons discussed above.

12. *White v. Secretary of Health and Human Services,* 910 F.2d 64, 65 (2d Cir.1990), also cited by *Tejada* (Tejada Br. at 12), is similarly distinguishable, because it also involved a stage five analysis where the burden of proof had shifted from the plaintiff to the Commissioner.

capacity to perform her prior work, including the absence of any credible medical evidence that Tejada's ability to lift was more than "slightly" limited.

## CONCLUSION

For the reasons set forth above, upon review of the administrative record, I find that the Commissioner has presented substantial evidence that Ms. Tejada was "not disabled," within the meaning of the Social Security Act and had the residual functional capacity to perform her past work. Accordingly, I recommend that the Court grant the Commissioners motion for judgment on the pleadings and deny Tejada's cross-motion.

### FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from receipt of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Sidney H. Stein, 500 Pearl Street, Room 1010, and to the chambers of the undersigned, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Stein. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *IUE AFL—CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993), *cert. denied,* 513 U.S. 822, 115 S.Ct. 86, 130 L.Ed.2d 38 (1994); *Roldan v. Racette,* 984 F.2d 85, 89 (2nd Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696 (1992); *Small v. Secretary of Health & Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 57–59 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237–38 (2d Cir.1983); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).